AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
for the
Southern District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)*<br><br>Blue Xiamoi Redmi phone, evidence bag number<br>S001875914 ("Target Device 1") | )<br>)<br>)<br>)   Case No.   26-mj-01683-DEB<br>)<br>)<br>) |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A-1, incorporated herein by reference.

located in the _____Southern_____ District of _____California_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B-1, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

❑ contraband, fruits of crime, or other items illegally possessed;

❑ property designed for use, intended for use, or used in committing a crime;

❑ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 USC 2339B;<br>21 U.S.C. 959, 960, 960a, and 963 | Providing Material Support to Designated Foreign Terrorist Organization;<br>International Manufacture or Distribution of Controlled Substances,<br>Narcoterrorism, and Conspiracy |

The application is based on these facts:

See Attached Affidavit of FBI Special Agent Morgan Cipoletta, incorporated herein by reference

☑ Continued on the attached sheet.

❑ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Morgan Cipoletta*
*Applicant's signature*

Morgan Cipoletta, FBI Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____telephone_____ *(specify reliable electronic means).*

Date:   3/24/2026

*Judge's signature*

City and state:   San Diego, California      Honorable Daniel E. Butcher, U.S. Magistrate Judge
*Printed name and title*

**ATTACHMENT A-1**

PROPERTY TO BE SEARCHED

The following property is to be searched:

      a. Blue Xiamoi Redmi phone, evidence bag number S001875914, seized from Teodulio ANACONA Papamija during his arrest on February 1, 2026 (**"Target Device 1"**)

**Target Device 1** is currently in the custody of the DEA San Diego Field Division located at 4560 Viewridge Avenue, San Diego, California 92123.

### **ATTACHMENT B-1**

ITEMS TO BE SEIZED

Authorization to search the cellular telephone described in Attachment A-1 includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephones for evidence described below.  The seizure and search of the cellular telephones shall follow the search methodology described in the affidavit submitted in support of the warrant.

The evidence to be seized from the cellular telephones will be electronic records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data, for the period of January 1, 2020, up to and including February 1, 2026:

a.   tending to show planning, coordination, and efforts to manufacture and distribute controlled substances internationally, including for ultimate distribution within the United States, and related violence to maintain territorial control, and;

b.   tending to identify accounts, facilities, storage devices, and/or services– such as email addresses, IP addresses, and phone numbers–used to facilitate the manufacture and distribution of controlled substances internationally, including for ultimate distribution within the United States, and related violence to maintain territorial control;

c.   tending to identify co-conspirators, criminal associates, or others involved in the manufacture and distribution of controlled substances internationally, including for ultimate distribution within the United States, and related violence to maintain territorial control;

d.   tending to identify travel to or presence at locations involved in the manufacture and distribution of controlled substances internationally, including for ultimate distribution within the United States, and related violence to maintain territorial control, such as coca farms, laboratories, load houses, or delivery points;

e.   tending to identify the user of, or persons with control over or access to, the **Target Device**; and/or

    f.      tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

## <u>AFFIDAVIT</u>

I, Special Agent Morgan Cipoletta, being duly sworn, hereby state as follows:

### I.

### ITEMS TO BE SEARCHED

1. I submit this affidavit in support of an application for a warrant to search the following electronic devices:

    a. Blue Xiamoi Redmi phone, evidence bag number S001875914, seized from Teodulio ANACONA Papamija during his arrest on February 1, 2026 ("**Target Device 1**")

    b. White iPhone phone, evidence bag number S001875909, seized from Teodulio ANACONA Papamija during his arrest on February 1, 2026 ("**Target Device 2**");

as further described in Attachments A-1 and A-2, and to seize evidence of crimes, specifically violations of Title 18, United States Code, Section 2339B (providing, attempting to provide, or conspiring to provide material support or resources to designated foreign terrorist organizations) and Title 21 United States Code, Sections 959, 960, 960a, and 963 (manufacture or distribution of a controlled substance outside of the United States for importation into the United States, narcoterrorism, and conspiracy to do the same) as further described in Attachments B-1 and B-2.

2. The requested warrant relates to the investigation and prosecution of Teodulio ANACONA Papamija ("ANACONA"), and other known and unknown co-conspirators, for their involvement in an international conspiracy to manufacture and distribute controlled substances, provide material support or resources to a designated foreign terrorist organization, and narcoterrorism. The **Target Devices** are currently in the custody of the Drug Enforcement Agency ("DEA") San Diego Field Division ("SDFD") located at 4560 Viewridge Avenue, San Diego, California 92123.

3. The information contained in this affidavit is based upon my training, experience, investigation, and consultation with other members of law enforcement.

1

Because this affidavit is made for the limited purpose of obtaining a search warrant for the **Target Devices**, it does not contain all the information known by me or other agents regarding this investigation. All dates and times described are approximate.

## II.

## TRAINING AND EXPERIENCE

4.    I am a Special Agent with the Federal Bureau of Investigation (FBI). I am an investigative or law enforcement officer within the meaning of Title 18, United States Code, Section 2510(7); that is, an officer of the United States, who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516.

5.    I have been employed as a Special Agent with the FBI since July 2024. I completed approximately eighteen weeks of training at the FBI Academy in Quantico, Virginia. During the training, I received instruction in a variety of investigative techniques commonly used in support of a wide range of the FBI's investigative priorities. The training included instruction regarding the use of confidential human sources, electronic and physical surveillance techniques, law enforcement tactics, search and seizure laws and techniques, interviewing strategies and skills, forensic techniques, and other subjects. Since May 2025, I have been assigned to the Homeland Security Task Force (HSTF) of the San Diego Field Office tasked with investigating organized criminal enterprises involved in large-scale smuggling, distribution, and sale of illegal drugs. I have received training with respect to the enforcement of drug laws and I have been involved in several investigations involving illegal drugs. Prior to becoming a Special Agent, I worked for the FBI as an Operational Support Technician since November 2021. In my capacity as an Operational Support Technician, I worked in the Operations Center and on the Joint Terrorism Task Force, where I handled administrative tasks in cooperation with case agents, intelligence and tactical analysts, and law enforcement agencies. I received Bachelor degrees in Communication Studies and Criminal Justice from Northern Arizona University, and a

Master's degree in Emergency Management and Homeland Security from Arizona State University.

6.    Through my training and experience, I have become familiar with transnational criminal organizations' methods of operation including their structure; the manufacturing, distribution, storage, and transportation of drugs; the collection of money proceeds derived from drug trafficking and other criminal activity; and the methods of money laundering used to conceal the nature of the proceeds and through this, know they rely heavily upon telephone communication and social media to communicate with associates and co-conspirators to include the use of messaging applications such as WhatsApp, e-mail services, social media and cellular phones, to communicate with associates and co-conspirators. I have personally participated in the investigation of the drug trafficking and foreign terrorist organizations discussed in this affidavit.

7.    Through the course of my training, investigations, and conversations with other law enforcement personnel, I am aware that it is common practice for narcotics traffickers, including members of foreign terrorist organizations involved in drug trafficking, to work in concert utilizing cellular telephones and other portable electronic devices (such as Laptops, iPads, Tablets, etc.). This is true at every point in the narcotics supply chain, from manufacturing through distribution. With respect to narcotics traffickers and foreign terrorist organizations involved in the manufacturing and distribution of controlled substances, I am aware that members of these groups frequently communicate with the individual(s) responsible for: working in labs to produce controlled substances; picking up and delivering cash to pay for production of controlled substances; procuring weapons and securing personnel to engage in violence to protect territory where controlled substances are produced and distributed; and negotiating the international distribution of the controlled substances produced by the organization. Conspiracies involving the manufacture and distribution of controlled substances, material support for foreign terrorist organizations, and narcoterrorism generate many types of evidence including, but not limited to, cellular telephone related evidence such as voice mail

3

messages referring to the arrangements of production, payment, provision of services, provision of personnel, and provision of other pecuniary value; names; photographs; text messaging; and phone numbers of co-conspirators. These communications can occur before, during and after the narcotics are manufactured and transported.

8.    Based upon my training, experience, and consultations with law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I am aware that cellular telephones (including their SIM card(s)) can and often do contain electronic evidence, including, for example, phone logs and contacts, voice and text communications, and data, such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone. Specifically, searches of cellular telephones of individuals involved in the manufacture and distribution of narcotics in support of foreign terrorist organizations may yield evidence:

a.    tending to show planning, coordination, and efforts to manufacture and distribute controlled substances internationally, including for ultimate distribution within the United States, and related violence to maintain territorial control, and ;

b.    tending to identify accounts, facilities, storage devices, and/or services– such as email addresses, IP addresses, and phone numbers–used to facilitate the manufacture and distribution of controlled substances internationally, including for ultimate distribution within the United States, and related violence to maintain territorial control;

c.    tending to identify co-conspirators, criminal associates, or others involved in the manufacture and distribution of controlled substances internationally, including for ultimate distribution within the United States, and related violence to maintain territorial control;

d.    tending to identify travel to or presence at locations involved in the manufacture and distribution of controlled substances internationally, including for ultimate distribution within the United States, and related violence to maintain territorial control, such as coca farms, laboratories, load houses, or delivery points;

e.    tending to identify the user of, or persons with control over or access to, the **Target Devices**; and/or

4

f.       tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

## III.

## FACTS SUPPORTING PROBABLE CAUSE

### A. Background

### *The CDF and Segunda Marquetalia (FARC-SM)*

9.     The Border Commandos, also known as "Comandos de la Frontera" or "CDF," is one of the most powerful criminal groups in southern Colombia. The CDF is responsible for protecting coca crops and operating cocaine processing labs in the Putumayo region, an area of dense rainforest that is one of Colombia's top cocaine producing regions. The CDF has significant influence over the cocaine trafficking supply chain worldwide, and specifically into the United States, with direct ties to international contacts for the negotiation and distribution of multi hundred-kilogram quantity drug shipments in South America to various cartels in Central America to ultimately be delivered into the United States and elsewhere.

10.    The CDF formed around 2017, shortly after the Fuerzas Armadas Revolucionarias de Colombia ("FARC") signed a peace accord with the Colombian government. The CDF is comprised of the residual members of the FARC fronts from the area, and it is part of the Segunda Marquetalia (FARC-SM), an umbrella organization comprised of multiple Colombian guerilla groups, which was designated as a Foreign Terror Organization (FTO) by the Secretary of the State of the United States on December 1, 2021.

11.    In March of 2024, the Mexican Navy seized a shipment of approximately 1,500 kilograms of cocaine from vessels in the Pacific Ocean, belonging to the then-leader of the CDF, Geovany Andres Rojas, alias Araña ("Rojas").[1]  Rojas commanded the CDF

---

[1] Agents received GPS coordinates for the cocaine shipment, as well as encrypted messages corroborating that the cocaine belonged to Rojas, from Cooperating Defendant 1 ("CD-1"). CD-1 was indicted for International Conspiracy to Distribute Controlled Substances

until February 2025, when he was arrested and charged in the Southern District of California with violations of Title 21, U.S.C., Secs. 959, 960 and 963, and 960a (International Conspiracy to Distribute Controlled Substances and Narcoterrorism) for his involvement in the CDF. Rojas currently is in custody in Colombia, pending extradition to the United States.

12.    Witnesses have told investigators that, during Rojas' leadership, the CDF grew to control the entire Putumayo region, with over 1,000 fighters spread across CDF territories in the area. For example, Cooperating Defendant 2 ("CD-2") met Rojas in approximately 2019.[2] CD-2, who was not a member of the CDF, held a political position in the Putumayo area. As the CDF grew in power, Rojas approached CD-2 and attempted to remove CD-2 from his leadership position in the region. CD-2 and Rojas settled their dispute by CD-2 agreeing to allow Rojas to conduct his drug trafficking operations.

13.    CD-2 understood that the CDF controlled the entire area of Putumayo, and anyone who comes and goes from Putumayo is purchasing cocaine directly from the CDF. CD-2 stated the CDF are heavily armed and have gained territorial control by force.

14.    CD-2 learned of several clandestine laboratories used by the CDF for the production of cocaine and personally observed the clandestine laboratories and other rural properties used by the CDF. In one laboratory, CD-2 saw blue, 60-gallon drums and white, 20-gallon drums holding precursors used to produce cocaine.

---

in this District and agreed to cooperate in exchange for consideration at sentencing. However, CD-1 is not subject to extradition from his/her home country and is no longer in contact with U.S. law enforcement. U.S. law enforcement understands that he/she has pending criminal charges in Ecuador. U.S. law enforcement has not provided payment to CD-1 and is not aware of him/her receiving payment from Ecuadorian authorities.

[2] CD-2 was convicted of International Conspiracy to Distribute Controlled Substances in the Eastern District of Texas and sentenced 108 months in custody on May 1, 2025. He/she agreed to cooperate with U.S. law enforcement to obtain consideration at sentencing in that proceeding and is cooperating pursuant to that agreement. Agents believe he/she also is cooperating in the hope of receiving further consideration. Agents are not aware that CD-2 has received payment for his/her cooperation. I believe the information provided by CS-2 to date has been credible and reliable.

15.     Per CD-2, all of the cocaine produced by the CDF is transported by land to Ecuador, to be further distributed by sea to various countries to include the United States. CD-2 stated that, during the time period he was in Putumayo, an average of 10,000 kilograms of cocaine per month was being produced and distributed by the CDF. CD-2 stated that CDF remain very active and continue to grow into power and most recently have gained control of Ecuadorian ports.

*Teodulio ANACONA Papamija*

16.     Teodulio ANACONA Papamija, aka "Pitufo," has been a member of the CDF from at least 2020 to the present and ascended to the leadership Group of CDF. Until his arrest on February 1, 2026, he commanded the area of Putumayo on the border of Peru. As commander of his own region, ANACONA controlled approximately one hundred soldiers, who engaged in various illicit activities including drug trafficking, extortion, arms trafficking and acts of terrorism, with the drug trade as the primary source of income. ANACONA's role spanned from purchasing cocaine paste, coordinating the movement of the paste into refinery labs for final cocaine production, and enforcing CDF's control of territory through violence, including murder. ANACONA was indicted in the Southern District of California on February 24, 2026, for providing material support to a foreign terrorist organization, in violation of Title 18, United States Code, section 2339B, beginning on a date unknown, but at least by on or about December 1, 2021, and continuing up to and including on or about January 31, 2026.

*Statutory Framework*

17.     Pursuant to 18 U.S.C. § 2339B (providing or attempting or conspiring to provide material support or resources to designated foreign terrorist organizations), it is unlawful to knowingly provide, or attempt or conspire to provide, material support or resources to a foreign terrorist organization.  To violate this section, a person must know that the organization is a designated terrorist organization, as defined in 18 U.S.C. § 2339B(g)(6), that the organization has engaged or engages in terrorist activity, as defined in section 212(a)(3)(B) of the Immigration and Nationality Act, or that the organization has

engaged or engages in terrorism as defined in section 140(d)(2) of the Foreign Relations Authorization Act, Fiscal Years 1988 and 1989. Where the form of material support alleged is the providing of personnel, the person must have knowingly provided, attempted to provide, or conspired to provide the personnel, which may include oneself, to work under the terrorist organization's direction or control or to organize, manage, supervise, or otherwise direct the operation of that organization. *See* 18 U.S.C. § 2339B(h).

18.     Pursuant to 21 U.S.C. §§ 959, 960, and 963 (international conspiracy to distribute cocaine), it is unlawful to join an agreement between two or more persons to manufacture or distribute cocaine outside the United States, knowing and intending that the cocaine will be imported into the United States.

19.     Pursuant to 21 U.S.C. § 960a, it is unlawful to knowingly and intentionally manufacture or distribute a controlled substance, knowing or intending to provide something of pecuniary value, either directly or indirectly, to any person or organization whom the defendant knows has engaged in or is engaging in terrorist activity. The term "anything of pecuniary value" means "anything of value in the form of money, a negotiable instrument, a commercial interest, or anything else the primary significance of which is economic advantage." 18 U.S.C. § 1958(b)(1).

20.     Agents have interviewed two confidential sources, both former members of the CDF, who worked with or under ANACONA during their time in the organization and observed firsthand ANACONA's involvement in overseeing cocaine manufacturing and international distribution in the region of Putumayo under his control, and his use of weapons and violence to enforce CDF control in his region. The sources understood that ANACONA engaged in this conduct to support the CDF, and thereby Segunda Marquetalia (hereinafter "CDF/FARC-SM"), by providing both money and personnel.

**B. ANACONA Oversaw Cocaine Manufacturing and Distribution for the CDF**

21.     ANACONA recruited Confidential Source 1 ("CS-1")[3] into the CDF/FARC-

_____

[3] CS-1 is a former member of CDF who currently is cooperating with law enforcement in Colombia, and with U.S. authorities, in an effort to safely separate him/herself from

8

SM in approximately 2020. CS-1 remained in communication with ANACONA until around the time of ANACONA's arrest this year, but left the CDF/FARC-SM in approximately 2023.

22.    During CS-1's time in the CDF/FARC-SM, CS-1's role grew from a coca farmer to directly assisting ANACONA with the CDF/FARC-SM's drug-trafficking enterprise. CS-1 learned of ANACONA's leadership role in the CDF/FARC-SM first-hand, observing ANACONA receiving money to pay for cocaine paste via shipments arriving in the region by boat, receiving cocaine paste from farms in Putumayo, coordinating the conversion of cocaine paste to finished cocaine, participating in the distribution of finished cocaine to foreign buyers, and enforcing the CDF/FARC-SM's territorial control using weapons and violence.

23.    For example, CS-1 him/herself transported cocaine paste to ANACONA for further processing into cocaine. CS-1's first harvest as a coca farmer, which he/she delivered to ANACONA, amounted to approximately 13,270 grams of cocaine paste. CS-1 also worked in jungle laboratories for the CDF/FARC-SM, at ANACONA's direction. Based on this work, CS-1 estimated that ANACONA's region, together with two other nearby CDF/FARC-SM units led by other commanders, could produce up to 1,000 kilograms of cocaine paste in a month.

24.    CS-1 was aware that, in approximately August of 2021, ANACONA and other area CDF/FARC-SM leaders dispatched approximately 400 kilograms of cocaine paste through Carlos Arley Correa Vidal ("Correa"), a CDF/FARC-SM member whom CS-1 knew personally, in the area of Puerto Leguizamo, Putumayo, Colombia. Colombian

ANACONA. U.S. law enforcement is not aware that CS-1 has any criminal convictions or pending charges in Colombia, and CS-1 has no criminal history in the United States. Law enforcement believes CS-1 is also seeking immigration benefits for him/herself and his/her family through cooperation. CS-1 has received payments from U.S. law enforcement totaling approximately $6,000, and U.S. law enforcement believe he/she has also received payments from Colombian law enforcement in an unknown amount. I believe the information provided by CS-1 to date has been credible and reliable.

9

authorities seized the paste and arrested Correa, who was subsequently murdered in prison. CS-1 understood that Correa was working on behalf of the CDF/FARC-SM, and that ANACONA was one of Correa's bosses. CS-1 stated that the CDF/FARC-SM ordered Correa's killing because commanders believed he was cooperating with law enforcement.

25.    CS-1 also collected and delivered money to ANACONA and other CDF/FARC-SM leaders, which ANACONA used to pay for cocaine paste, compensate the organization's members and farmers, and buy weapons. On one occasion, he/she helped deliver 15 billion pesos (approximately $3.5 Million USD), which arrived by boat, directly to ANACONA and other CDF/FARC-SM commanders.

26.    CS-1 stated that he/she understood that the CDF/FARC-SM generated income through cocaine trafficking from Colombia, through Ecuador, and to what he/she believed to be cartels in Mexico. Based on my training and experience, this is a common cocaine route in which there is a high likelihood that the cocaine will ultimately be imported into the United States.

27.    Confidential Source 2 ("CS-2") is a documented member of the CDF/FARC-SM who was arrested by the Colombian government for his/her activities related to the organization.[4] CS-2 was a member of the CDF/FARC-SM between 2021 and 2023.

28.    During his/her time as a member of the CDF/FARC-SM, CS-2 knew ANACONA as a commander in the organization, whose role included cocaine production in the region under ANACONA's control. On one occasion, CS-2 saw the commander of his unit deliver money to ANACONA for the sale of cocaine. CS-2 also observed that ANACONA attended CDF/FARC-SM trainings.

---

[4] CS-2 does not have any criminal history in the United States, and U.S. law enforcement is not aware that he/she has any convictions in Colombia. CS-2 was released from custody in Colombia and is cooperating with Colombian and U.S. law enforcement in the hope of assistance in separating him/herself safely from the CDF. CS-2 has received payments from U.S. law enforcement totaling approximately $7,000, and U.S. law enforcement believe he/she has also received payments from Colombian law enforcement in an unknown amount. I believe the information provided by CS-2 to date has been credible and reliable.

**C. ANACONA Used Weapons and Violence to Enforce CDF's Territorial Control**

29.    During their membership in the CDF/FARC-SM, both CS-1 and CS-2 observed that a significant part of the organization's purpose was to protect the territory in which cocaine was grown and produced from encroachment by rival criminal groups. CDF/FARC-SM commanders, including ANACONA, oversaw units of guerrillas who fought competing criminal organizations and killed civilians they suspected of supporting rival groups. The CDF/FARC-SM used weapons for this violence, including handguns, rifles, machine guns, and explosives.

30.    On one occasion, CS-1 observed ANACONA shoot and kill a family of three civilians. CS-1 was present during discussions in which ANACONA indicated he suspected the family of spying for a rival criminal group. CS-1 understood that ANACONA killed the family in order to assure that CDF/FARC-SM maintained control of territory.

31.    According to CS-1 and CS-2, ANACONA's activities in Putumayo were conducted on behalf of CDF/FARC-SM. As such, I believe he participated in an international conspiracy to manufacture and distribute cocaine, knowing and intending that the cocaine would be imported into the United States; that he provided money from the sale of cocaine to the CDF/FARC-SM; and that he provided material support, in the form of money and personnel, to the CDF/FARC-SM. As a leader of CDF/FARC-SM, I believe ANACONA was aware of the Segunda Marquetalia's status as a designated terrorist organization and its terrorist activities and terrorism. Based on my training and experience, I also know that when large amounts of cocaine are produced in Colombia and transported northward to Central America and Mexico, the producers of the cocaine are aware that there is a high likelihood that the cocaine will ultimately be imported into the United States.

**D. Arrest of ANACONA and Seizure of the Target Devices**

32.    On February 1, 2026, Teodulio ANACONA Papamija was arrested by Colombian authorities in the region of Puerto Asis, Colombia, pursuant to an arrest warrant issued out of the Southern District of California, for violations of Title 18 U.S.C. Section

11

1339B - Providing Material Support to a Foreign Terrorist Organization. The **Target Devices** were located next to where ANACONA was sleeping at the time of his arrest, and Colombia law enforcement seized them at that time. ANACONA subsequently confirmed to Colombian law enforcement that the **Target Devices** belonged to him.  On March 4, 2026, the **Target Devices** were transferred to DEA agents in Colombia for evidence and safekeeping. On March 10, 2026, the **Target Devices** were transferred to DEA agents in this District.

33.    Based on my experience and training, consultation with other law enforcement officers, and all the facts and opinions set forth in this affidavit, I believe that telephone numbers, contact names, email addresses, appointment dates, messages, pictures, and other digital information are likely stored in the memory of the **Target Devices**. Further, in light of the above facts and my experience and training, there is probable cause to believe that ANACONA was using the **Target Devices** to communicate with others in connection with the illegal scheme to engage in international drug trafficking and related violence in support of the CDF/FARC-SM. Further, from my training and experience, I know that participants in international drug trafficking and foreign terrorist organizations may be involved in the planning and coordination of drug manufacturing and violence to maintain territorial control on a continuous and repeating basis; such communications are generally necessary to coordinate delivery of supplies, manufacture and transportation of drugs, and the movement of weapons and fighters. Further, based on the investigation, I believed ANACONA was engaged in the conduct described herein from at least 2020 until February 1, 2026.  In light of all the foregoing, I request permission to search the **Target Devices** for data beginning on **January 1, 2020,** up to and including **February 1, 2026**.

## METHODOLOGY

34.    It is not possible to determine, merely by knowing the cellular telephone's make, model and serial number, the nature and types of services to which the **Target Devices** are subscribed and the nature of the data stored on the **Target Devices**. Cellular

devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the **Target Devices** may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network.  Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

35.     Following the issuance of this warrant, I will collect the **Target Devices** and subject it to analysis. All forensic analysis of the data contained within the telephone and its memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

36.     Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days of the date the warrant is signed, absent further application to this court.

/ /

/ /

13

**PRIOR ATTEMPTS TO OBTAIN THIS EVIDENCE**

37. Law enforcement has not previously attempted to obtain the evidence sought by this warrant.

**CONCLUSION**

38. Based on the facts and information set forth above, I submit there is probable cause to believe that a search of the **Target Devices** will yield evidence of ANACONA's violations of Title 18, United States Code, Section 2339B and Title 21 United States Code, Sections 959, 960, 960a, and 963. Accordingly, I request that the Court issue a warrant authorizing law enforcement to search the items described in Attachments A-1 and A-2 and seize the items listed in Attachments B-1 and B-2 using the above-described methodology.

I swear the foregoing is true and correct to the best of my knowledge and belief.

*Morgan Cipoletta*

_____
Special Agent Morgan Cipoletta
Federal Bureau of Investigation

Sworn and attested to under oath by telephone, in accordance with Federal Rule of Criminal Procedure 4.1, this 24th day of March, 2026.

_____
Honorable Daniel E. Butcher
United States Magistrate Judge

14